**BURRUSS et al. v. EARLY, Collector of Internal Revenue.**

No. 61.

District Court, W. D. Virginia, at Lynchburg.

March 23, 1942.

John L. Abbot, of Lynchburg, Va., and Showalter, Parsons, Kuyk & Staples, of Roanoke, Va., for plaintiffs.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Frank S. Tavenner, Jr., U. S. Atty., of Woodstock, Va., for defendant.

BARKSDALE, District Judge.

This action having been tried upon the facts by the Court without a jury, the Court doth hereby find the facts specially and state separately its conclusions of law thereon, and directs the entry of the appropriate judgment, as follows, in conformity with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c:

### Findings of Fact.

(1) The plaintiffs are R. S. Burruss and W. H. Burruss, partners, trading as Burruss Land and Lumber Company. The defendant is N. D. Early, Jr., Collector of Internal Revenue for the District of Virginia. They are the proper parties to this action.

(2) Plaintiffs are engaged in the business of accumulating, storing, drying, dressing, and selling lumber, in large part in interstate commerce. They deal chiefly in pine, poplar and oak. They own and operate five plants and concentration yards, located respectively at Dillwyn, Brookneal, Ontario, Blackstone, and Pamplin, equipped primarily to store, dry, re-saw and dress rough lumber of standard dimensions. They maintain a business and sales office in Lynchburg. In their business, plaintiffs regularly employ approximately four hundred persons, with respect to whom they have regularly filed Social Security and unemployment insurance returns and regularly paid Social Security and unemployment taxes.

(3) The taxes here sought to be recovered were assessed against and paid by plaintiffs on involuntary returns of taxes under the Federal Insurance Contributions Act, 26 U.S.C.A. Int.Rev.Code § 1400 et seq., and its predecessor, Title VIII of the Social Security Act, 42 U.S.C.A. § 1001 et seq., (Subchapter A of Chapter 9 of the Internal Revenue Code and Title VIII Act of August 14, 1935, c. 531), for the calendar years 1937, 1938, 1939, and the first quarter of 1940, and under the Federal Unemployment tax act, 26 U.S.C.A. Int.Rev. Code § 1400 et seq., and its predecessor, Title IX of the Social Security Act, 42 U.S.C.A. § 1101 et seq. (Subchapter C of Chapter 9 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code § 1600 et seq., and Title IX, Act of August 14, 1935, c. 531), for the calendar years 1936, 1937, 1938 and 1939. These taxes were assessed with respect to the supposed employment by plaintiffs of (a) a few individuals who sold logs or lumber to plaintiffs, (b) a number of persons operating sawmills, sawing plaintiffs' lumber, and their employees, and (c) a number of individuals who haul lumber by truck for plaintiffs.

The issue to be determined here is whether or not plaintiffs were legally liable to defendant for any of the taxes assessed, the question of amount to be settled later if liability be found for any part thereof. No contention is made by defendant that the taxes assessed with respect to the vendors of logs and lumber to plaintiffs and employees of such vendors were valid, and, indeed, no such contention could be sustained. The principal question is with respect to the sawmill operators, the truckers, and their respective employees, concerning whom these findings in the main relate.

(4) The plaintiffs obtain rough lumber in three ways. A comparatively small amount comes from mills sawing their own logs at Brookneal and Ontario. Between 20 and 25 percent they acquire by purchase. The rest they obtain from timber, the right to cut and remove which they acquire by written contract from land owners near their plants. In order to get rough lumber from such timber, plaintiffs enter into contracts with various professional sawmill operators who generally agree to fell, log and saw the timber and deliver the resulting rough lumber to plaintiffs' yards at stated prices per thousand feet.

Plaintiffs have been obtaining their rough lumber in this way, and have been dealing with such operators on the terms and in the manner described in these findings, for twenty years. Since the Social Security Act, 42 U.S.C.A. § 301 et seq., and Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., went into effect, the operators agree to pay the taxes and observe the regulations required by such acts. There is no indication that plaintiffs have attempted to alter their dealings with the operators in order to avoid any effect of such laws.

(5) The business followed by the operators in question—that is, the business of sawmilling—is an established and recognized trade. The operators are all known in their respective communities as regular sawmill operators. The majority have been in business longer than plaintiffs. Those who operate their own sawmills own sawmilling equipment worth

variously from $500.00 to $2,500.00. Most, in addition to sawmilling, own and operate farms, stores, flour mills, filling stations, for-hire trucks, and the like.

(6) The contracts between plaintiffs and the sawmill operators are oral. Generally the operator himself locates the timber, and, in order to get the contract, induces plaintiffs to buy. After viewing a tract, frequently together, the operator and plaintiffs discuss and orally agree on prices per thousand for converting the timber thereon into lumber and delivering the lumber to a specified yard or yards, generally the nearest. The prices vary from $8.00 to $13.00 for pine and poplar, with $2.00 or $3.00 additional for oak. The operator receives or reads a copy of, and agrees to abide by, plaintiffs' contract with the land owner, showing the boundary of the lumber bought, the kind and size which may be cut, the time within which it has to be removed, and frequently containing conditions about making roads, repairing fences, leaving laps, etc. This is usually all that is said. It is nevertheless understood between the parties, by custom of the trade and previous dealing, that the operator will assemble his equipment and crew and commence with reasonable dispatch and continue with reasonable diligence, to finish at longest within the time granted by the land owner, that in general he will produce lumber two inches thick, as wide as the log allows, and to the extent the timber will permit, in such lengths as plaintiffs may order, or, in the absence of orders, in lengths plaintiffs normally require, that he will receive a premium for lengths in excess of 18 or 20 feet, that he is not to cut oak except on special order, and that plaintiffs will settle with him each two weeks for deliveries to the date of settlement.

Generally the contract is for all the work necessary in connection with a given tract as a whole, from felling the trees to delivering the lumber. In a few instances, plaintiffs have let "divided contracts"—that is, the logging to one man, the sawing to another, the hauling to a third,—but this is exceptional.

(7) No right is reserved by plaintiffs to tell the operators what kind and size of lumber to cut beyond the right to call for the usual lengths, to call for unusual lengths at a premium price, and to call for special orders of oak. The operators themselves determine where on the tract to set up their sawmills, and from time to time move them. The operators determine for themselves where to begin cutting, where to cut next, into what length logs to cut each tree, how to haul the logs to the mill, generally what size lumber to saw out of each log, where and how to stack the lumber, when to begin work, how many hours to work, what kind of work to do, and when to quit each day, whether to work or not on a particular day, whether to cut logs and saw simultaneously, or cut logs one day and saw the next, and all other detail of the work, entirely without supervision or interference by plaintiffs.

(8) No right is reserved by plaintiffs to tell the operators when to cut and when not to cut beyond the understanding at the outset that the operator will begin promptly and continue with reasonable diligence, and that oak is to be cut only on special order. Occasionally, when over- or understocked, plaintiffs have requested an operator to slow down or speed up deliveries, sometimes with and sometimes without success. Once in 1938 and once in 1939, plaintiffs requested all the operators to shut down. A few, possibly 15 or 20 percent, did. Most continued as usual, and plaintiffs continued to accept and pay for their deliveries. In the exceptional case of divided contracts, it is understood from the outset that the several contractors will so synchronize their work as to keep each other reasonably well occupied, and plaintiffs have on occasion insisted that one or the other catch up.

(9) No right is reserved by plaintiffs to remove or replace an operator merely because they disagree with his manner of operation, provided he is not breaching his contract by wasting the timber or delaying the operation beyond the time granted in the contract with the land owner. In one instance, an operator was ordered off the yard at Ontario, where he operated a mill sawing the company's logs by contract, for a condition of drunkenness endangering his own life. No other instance of discharge or removal, or assertion of such right, is shown by the evidence.

(10) The operators hire their own men, determine how many to employ, reduce or increase the number, determine how to pay them, whether by piece or by hour, and how much to pay them, pay them, assign and oversee their work, and fire them, en-

tirely without supervision or interference by plaintiffs.

(11) There are usually about 70 sawmilling operations in progress. In about 50 of these, the operators own and provide the sawmills used. In about 20, plaintiffs own the mills. In the latter cases, the agreed price is from 50¢ to $1.00 less per thousand than in comparable operations where the operator provides his own mill. The operators furnish all other equipment and supplies and make all repairs except for major repairs to mills owned by plaintiffs.

(12) Plaintiffs insisted that sawmill operators producing lumber for them, and truckers hauling their lumber, comply with the Fair Labor Standards Law and required them to certify that such law had been complied with, before receiving compensation under their contracts, although plaintiffs have recently been informed that the truckers were subject to regulation by the Interstate Commerce Commission and were not subject to the provisions of the Fair Labor Standards Law.

(13) Plaintiffs own and operate under ordinary merchants' licenses general stores in the communities where their plants are located. These stores are run by local managers who extend credit to such persons as they may see fit, including operators. Charges by the operators to their accounts at such stores are deducted from their settlements with plaintiffs each two weeks. The employees of the operators do not as such enjoy credit at plaintiffs' stores. If, however, an operator gives an employee express order or authority to purchase against his, the operator's, account, such order or authority will be honored, but the charge will be made to the operator, not the employee.

It occasionally happens that an operator will have sawed and stacked a quantity of lumber, but because of bad weather or other reason cannot make delivery. In such cases, if the operator needs and asks plaintiffs for money, plaintiffs will advance cash against tallies of the lumber on hand, without necessarily knowing why the operator wants the money or for what he uses it.

Plaintiffs also occasionally, at the request of an operator, advance funds to be repaid by deductions from future settlements at an agreed rate, or assist an operator to obtain credit from a third party by agreeing to deduct stated amounts from future settlements and pay the same over to such third party.

(14) The Unemployment Compensation Commission of Virginia has ruled that the operators in question are independent contractors. The Federal inspectors under the Fair Labor Standards Act require that the operators, as employers, keep wage and hour records for the men working under them. In a suit brought by three employees of one of the operators against plaintiffs for wages which the operator had failed to pay, the Trial Justice of Halifax County, Virginia, ruled that the operator was an independent contractor and dismissed the complaint.

(15) Plaintiffs own a number of trucks used to move lumber from their plants to the market. When other trucks are needed, and in the few cases of "divided contracts", to move lumber from sawmill to plant, plaintiffs enter into contracts with for-hire truckers to haul lumber from and to specific points at agreed prices per thousand. These hauling contractors, some 15 or 20 in all, provide the trucks, fuel, and supplies, hire and pay any helpers needed, select the routes, load and unload, without supervision or interference by plaintiffs. They all operate under Virginia TH licenses, authorizing them to carry, by contract, for the public generally. Some haul mostly for plaintiffs, some mostly for others.

## Conclusions of Law.

The defendant here, United States Collector of Internal Revenue for this district, assessed and required plaintiffs involuntarily to pay certain taxes under the Social Security Act. In order to provide old-age benefits and insurance against unemployment, the Social Security Act imposes taxes upon wages paid for employment, as an income tax upon the employee and an excise tax upon the employer. The defendant levied and collected the taxes here in controversy, upon the assumption that certain individuals were employed by the plaintiffs. If the defendant was correct in this assumption, the plaintiffs cannot recover: if the defendant was incorrect in this assumption, then the plaintiffs are entitled to recover, or at least to recover for so much of the taxes as were incorrectly levied. Plaintiffs raise no question as to the constitutionality of the Social

Security Act, nor could they, since the decision of the Supreme Court in Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293, and it having been heretofore ordered that if it should be determined that plaintiffs are entitled to recover a part of the amount sued for, but not the whole thereof, the amount to which plaintiffs are entitled should be left for future determination, the sole question for determination here is whether or not the persons included in the defendant's assessment, or any of them, were employees of the plaintiffs within the meaning and contemplation of the Social Security Act, within the period included in the assessments.

The Act itself defines "employment" as follows: "The term 'employment' means any service, of whatever nature, performed within the United States by an employee for his employer, except * * * [certain exceptions not pertinent here]." Title VIII, Social Security Act, 42 U.S. C.A. 1011(b), formerly section 811(b); Title IX Social Security Act, 42 U.S.C.A. 1107(c), formerly 907(c).

As to those persons who merely sold lumber or logs to plaintiffs, they obviously were not employees, and will receive no further consideration herein. Defendant contends that the other persons named in the assessments here in controversy were plaintiffs' employees, while plaintiffs contend that such persons were not their employees, but were independent contractors and the employees of such independent contractors. Therefore, the critical test of plaintiffs' liability for the taxes which they were required to pay and which they here seek to recover, is whether the persons named in the assessments were "employees" or "independent contractors" and their employees.

In determining the question here presented as to whether certain operators were "employees" or "independent contractors", it would seem that it should first be determined what law governs. Prior to the Social Security Act, it was generally considered that unemployment relief and old-age assistance presented problems for the individual states, not the federal government. Many of the states, however, were afraid to adopt any program of social security for employees "lest in laying such a toll upon their industries, they would place themselves in a position of economic disadvantage as compared with neighbors or competitors."

Congress sought to remedy this situation by, in Title IX of the original Social Security Act, first imposing an unemployment insurance tax upon the wages paid by employers to their employees, national in scope, but then allowing credits against such tax to the extent of 90 percent. for contributions paid into unemployment funds created by state law. By an Act of the General Assembly of Virginia, Acts of Assembly 1936–37, Ex.Sess. c. 1, a state unemployment fund was created as well as an Unemployment Compensation Commission to administer the Act. Thus it will be seen that this state, as well as other states, is interested in, and has a considerable stake in, the administration of the social security program created by the Social Security Act. However, the Social Security Act, the taxes therein imposed, and the program resulting therefrom, are national in scope, and it would seem that the determination of persons upon whom the tax is imposed is a federal question.

"In dealing with the meaning and application of an act of Congress enacted in the exercise of its plenary power under the Constitution to tax income and to grant exemptions from that tax, it is the will of Congress which controls, and the expression of its will, in the absence of language evidencing a different purpose, should be interpreted 'so as to give a uniform application to a nation-wide scheme of taxation'. Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199. Congress establishes its own criteria and the state law may control only when the federal taxing act by express language or necessary implication makes its operation dependent upon state law."

Lyeth v. Hoey, 305 U.S. 188, 194, 59 S.Ct. 155, 158, 83 L.Ed. 119, 119 A.L.R. 410.

It seems to me that this is a case for the application of what Mr. Justice Jackson calls the federal common law, in his concurring opinion in the recent case of D'Oench, Duhme & Co., Inc., v. Federal Deposit Ins. Corp., March 2, 1942, 62 S.Ct. 676, 686, 86 L.Ed. ——, when he said:

"A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even con-

trolling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no juridical chameleon, changing complexion to match that of each state wherein law suits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law in cases such as the present. Board of Commissioners v. United States, 308 U.S. 343, 350, 60 S.Ct. 285, 288, 84 L.Ed. 313."

■ I find no case, nor has any been cited to me, in which a federal court has applied the law to the factual situation existing here. Of course, there have been decisions of federal courts in which the meaning of the terms "employer" and "employee", as used in the Social Security Act, have been considered. It has been stated, "there is nothing in the Social Security Act which suggests that the terms 'employer' and 'employee' should receive anything but their ordinary construction." Indian Refining ·Co. v. Dallman, D.C., 31 F.Supp. 455, 460, affirmed and opinion approved and adopted 7 Cir., 119 F.2d 417. Both in this case and the case of Texas Co. v. Higgins, 2 Cir., 118 F.2d 636, it was held that an oil distributor was an independent contractor and not an employee within the contemplation of the Social Security Act. The case of Kentucky Cottage Industries, Inc., v. Glenn, D.C., 39 F.Supp. 642, held that persons making comforters, quilts and similar articles by hand, under a contract with the plaintiff, were independent contractors and not employees under the Act. In the case of In re Ten Eyck Co., Inc., D.C., 41 F.Supp. 375, it was held that an orchestra leader, whose orchestra played for an hotel, and was compensated by a lump sum payment under an oral contract, was an independent contractor and not an employee of the hotel under the provisions of the Act. In the cases of Jones v. Goodson, 10 Cir., 121 F. 2d 176, and Kaus v. Huston, D.C., 35 F. Supp. 327, it was held that the persons there involved, drivers of taxicabs, were employees and not independent contractors.

However, irrespective of their ultimate conclusions, all these cases recognize that the Social Security tax "does not extend to instances where persons performing services are independent contractors." Jones v. Goodson, supra, 121 F.2d page 179.

Pursuant to authority in the Act, the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, issued regulations under both Titles VIII and IX, for the enforcement of the Act, which are pertinent here. The regulation under Title VIII is known as Treasury Regulation 91 and the pertinent section is Article 3, and the regulation under Title IX is known as Treasury Regulation 90 and the pertinent section is Article 205.

After the repeal and· reenactment of the Act, these regulations were reissued without substantial difference, the new regulations being Treasury Regulations 106, the pertinent section being 402.204, and Treasury Regulation 107, the pertinent section being Section 403.204. These Treasury Regulations are as follows:

Treasury Regulations 91, Article 3:

"Art. 3. Who are employees.—Every individual is an employee within the meaning of Title VIII of the Act if he performs services in an employment as defined in section 811(b) (see article 2).

"However, the relationship between the person for whom such services are performed and the individual who performs such services must as to those services be the legal relationship of employer and employee. Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are

the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee.

"Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

"Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

"If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, or independent contractor."

Treasury Regulation 90, Article 205:

"Art. 205. Employed individuals.—An individual is in the employ of another within the meaning of the Act if he performs services in an employment as defined in section 907(c). However, the relationship between the individual who performs such services and the person for whom such services are rendered must, as to those services, be the legal relationship of employer and employee. The Act makes no distinction between classes or grades of employees. Thus, superintendents, managers, and other superior employees are employees within the meaning of the Act.

"The words 'employ', 'employer', and 'employee', as used in this article are to be taken in their ordinary meaning. An employer, however, may be an individual, a corporation, a partnership, a trust or estate, a joint-stock company, an association, or a syndicate, group, pool, joint venture, or other unincorporated organization, group, or entity. An employer may be a person acting in a fiduciary capacity or on behalf of another, such as a guardian, committee, trustee, executor or administra-tor, trustee in bankruptcy, receiver, assignee for the benefit of creditors, or conservator.

"Whether the relationship of employer and employee exists, will in doubtful cases be determined upon an examination of the particular facts of each case.

"Generally the relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor, not an employee.

"If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if two individuals in fact stand in the relation of employer and employee to each other, it is of no consequence that the employee is designated as a partner, coadventurer, agent, or independent contractor."

These regulations, although not binding upon the Court, are entitled to "respectful consideration", and should be followed "unless unreasonable or inconsistent with the statute". Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397; United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

Throughout the United States, the courts have frequently been called upon to differentiate between the employer-employee relationship and that of independent con-

tractor. Such decisions arrive at a contrariety of results upon a variety of factual situations. It would serve no useful purpose to undertake the task of analyzing or citing these decisions.

█ It is useful, in my opinion, to consider the situation in Virginia. It would seem that the law of Virginia should be considered as "highly persuasive", for the particular reason that the courts and administrative agencies of this state, certainly to some extent, know and are familiar with the method of lumbering in Virginia and the relationship between sawmillers and lumbermen such as plaintiffs here.

In the case of Epperson v. De Jarnette, 164 Va. 482, 180 S.E. 412, 413, the Virginia Court of last resort had for determination the question of whether one operating a sawmill for a lumber concern similar to the plaintiffs here, was an "employee" or an "independent contractor", in order to determine liability for a tort. The facts, as stated in the Court's opinion, show that the method of operation was substantially the same as in that situation here presented, which is to my mind least favorable to the plaintiffs, i. e., where the plaintiffs owned the sawmill used by the operator. In that case, the lumber company concerned entered into a contract with a sawmiller to saw into lumber a certain body of standing timber upon land owned by it, at a certain rate of pay per thousand feet of lumber. The lumber company owned the sawmill which was used, it logged the mill, and hauled away the sawed lumber. The sawmiller hired and paid for such labor as was necessary, and the lumber company exercised no control over his operations. In holding that the sawmiller was not an employee, but an independent contractor, the Court said:

"Was Scott an independent contractor? We reach without difficulty the conclusion that he was.

"'An independent contractor is one who undertakes to produce a given result without being in any way controlled as to the method by which he attains that result.' Jaggard on Torts, § 73, p. 228.

"'The law defines an independent contractor to be a person who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work according to his own ideas, or in accordance with plans furnished by the person for whom the work is done, to whom the owner looks only for results.' Boyd, Higgins & Goforth v. Mahone, 142 Va. 690, 128 S.E. 259, 262.

"'An independent contractor may be defined as one who in the course of an independent occupation prosecutes and directs the work himself, using his own methods to accomplish it. Generally, where an independent contractor is employed to perform a work lawful in itself, and not intrinsically dangerous, the company, if it is not negligent in selecting the contractor is not liable for the wrongful acts or negligence of such contractor. It must appear that it either exercised or reserved the right to exercise control over the work and had the power to choose, direct, and discharge the employees of the contractor. In general it may be said that the liability of the company depends upon whether or not it has retained control and direction of the work.' Talley v. Drumheller, 135 Va. 186, 115 S.E. 517, 519.

"The ordinary test is this: 'Who has the power to control and direct the servants in the performance of their work?' Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 254, 53 L.Ed. 480. See, also, the late case of Roy C. Crowder and Bituminous Casualty Corp. v. John G. Haymaker [164 Va. 77], 178 S.E. 803, quite in point and decided by this court March 17, 1935; Baker v. Nussman & Cox, 152 Va. 293, 147 S.E. 246; Davis Bakery v. Dozier, 139 Va. 628, 124 S.E. 411; Clinchfield Coal Corp. v. Redd, 123 Va. 420, 96 S.E. 836."

Also, it appeared in the evidence that the Virginia Unemployment Commission has ruled that the sawmill operators here in question were independent contractors and not employees. There was also evidence that federal inspectors under the Fair Labor Standards Law require such operators as employers to keep the wage and hour records of their employees.

█ Although the above quoted Treasury Regulations are somewhat more comprehensive and detailed than the opinion of the Virginia Court in the case of Epperson v. DeJarnette, supra, it seems to me that the criteria in both instances are substantially the same. Judged by either or both, it is my conclusion that both the sawmill operators and those who haul lumber for plaintiffs by truck, under the facts of this case, are independent contractors and not employees.

It is true that plaintiffs were interested in the operations of the sawmillers, which interest was evidenced by occasional visits, written communications, occasional requests to hasten or retard operations, and in other ways. However, I see nothing in these manifestations inconsistent with, nor going beyond, the interest which one contracting party would naturally have in seeing that the other contracting party complies with the terms of their contract, and complies in such manner as to be advantageous to him.

■ I find no substantial evidence of any control of the sawmillers by plaintiffs, in their methods of operation or in the performance of their work, other than in the testimony of defendant's witness, Clay. This witness, a government investigator, recited from the witness stand a number of statements purporting to have been taken from a number of the sawmill operators included in defendant's assessment. I am satisfied that plaintiffs' motion to strike out this testimony should be granted, as this testimony was no more than hearsay; and this conclusion is strengthened by the fact that the testimony of those operators who were called as witnesses by the defendant differs substantially from their purported statements as given by the witness, Clay, and the further fact that a number of operators whose statements were read by the witness, Clay, were present at the trial in response to defendant's subpoenas, and were not called as witnesses.

My conclusions of law, upon the facts as found, are therefore:

(1) That the persons named in defendant's assessments who sold logs or lumber to plaintiffs, were not employees of plaintiffs.

(2) That the persons named in defendant's assessments who operated sawmills sawing plaintiffs' lumber were independent contractors, and that neither they nor their employees were employees of plaintiffs.

(3) That those persons named in defendant's assessments, who hauled lumber for plaintiffs, were independent contractors, and that neither they, nor their employees, were employees of plaintiffs.

(4) Since the persons referred to above are all the persons named in defendant's assessments here in controversy, it follows that it is my conclusion that the assessments here in controversy were erroneous in their entirety, and that the taxes here sought to be recovered were illegally assessed against, and collected of plaintiffs.

Therefore, judgment will be entered in favor of plaintiffs for the amount set out in their complaint, with interest from date of payment. Counsel will prepare and submit an order within ten days from this date.

### Addendum.

It appears from plaintiffs' testimony that plaintiffs have omitted to return and pay taxes upon the sum of $760.00 paid to its employee, R. R. Davis, during the year 1937. These wages were paid to this employee for services in estimating timber, looking after farms, and obtaining orders from the mills, etc. This is a matter not contemplated in the assessments, and has no bearing on the issues in this action. This omission may be corrected by the filing of a supplemental return by the plaintiffs.