"Q. Well the stopping and picking up was at your order? A. Yes, sir."

As the search of the smokehouse and garage was without probable cause, and as defendant did not waive his constitutional rights by peacefully complying with the orders of the officers in whose custody he was, to unlock the buildings, the evidence obtained as a result of the search cannot be used to secure his conviction. The agent requested him to unlock the buildings and he complied with the request. In so doing, he did not waive any rights which were afforded him under the Constitution.

In his motion defendant requests that the seized liquor be returned to him. The Government insists that Section 2912, Title 26 U.S.C.A., I.R.C., "All distilled spirits found elsewhere than in a distillery or internal revenue bonded warehouse, not

having been removed therefrom according to law, shall be forfeited to the United States," prohibits the return of the liquor. It also contends that under Section 2854, Title 26 U.S.C.A., I.R.C., the burden is placed on the defendant to show that the requirements of the law have been complied with.

So far as this proceeding is concerned, neither of these sections is applicable. Certainly there is no charge in the indictment and no suggestion from any other source that the tax paid liquor was not properly removed from a distillery or warehouse. If the court were to hold in accordance with the contention of the Government, the finding of the court that the search and seizure were unlawful would be completely nullified. What the Government may see fit to do in the future with respect to the forfeiture of the liquor is not now a matter for consideration by this court.

Defendant's motion is sustained and all of the liquor seized as a result of the searches, except the nontax paid liquor, is hereby ordered to be returned to the defendant.

The defendant denies ownership of the non-tax paid liquor. The non-tax paid liquor stands before the court unclaimed and without a defender. Its existence from the beginning was illegal and in it there can be no property rights. When those who deal in it are caught, they are quick to deny their association with it. Having no right to exist, its present keeper may destroy it as the law directs.

**EMARD et al. v. SQUIRE, Collector of Internal Revenue.**

**No. 594.**

District Court, W. D. Washington, S. D.

Jan. 4, 1945.

282

Raymond G. Wright, Clarence R. Innis, and Arthur E. Simon, all of Seattle, Wash., for plaintiffs.

J. Charles Dennis, U. S. Atty., and Harry Sager, Asst. U. S. Atty., both of Tacoma, Wash., and Thomas R. Winter, Sp. Asst. to Chief Counsel, Bureau of Internal Revenue, of Seattle, Wash., for defendant.

LEAVY, District Judge.

This is an action by the plaintiffs, co-partners, to recover the sum of $12,694.99, with interest from June 6, 1943, representing taxes, penalties and interest paid for the period beginning July, 1937, and ending September 30, 1942, under the Federal Insurance Contributions Act, 26 U.S.C.A.Int.Rev.Code, §§ 1400–1403, 1410, 1411, 1420–1432, formerly Title 8 of the Social Security Act, 42 U.S.C.A. § 1001 et seq. The defendant, by counterclaim, seeks an affirmative judgment in the sum of $515.99, plus interest covering a balance due for taxes, penalties and interest for said periods. It is admitted that if the plaintiffs do not sustain the burden of proof in support of the allegations they make, the defendant would be entitled to a judgment in this latter sum.

The facts are not disputed in this case. The specific issue here involved is the perplexing one of determining the relationship that existed between the plaintiffs and the persons who sold fish to them during the time in question. The tax, as levied and collected by the Collector of Internal Revenue, was based upon the payments made by plaintiffs for fish they purchased from the numerous individuals who were engaged in catching salmon in Cook Inlet of the Alaskan waters. It is the contention of plaintiffs that these fishermen were "independent contractors" engaged in the business of selling fish they had caught to the plaintiffs. It is the contention of the defendant that these fishermen were "employees" of the plaintiffs, and, therefore, subject to the tax.

The material facts are:

1. During all of the times herein mentioned and for many years preceding 1937, the plaintiffs, H. J. Emard and Loretta Emard, co-partners, doing business as Emard Packing Company, had been engaged in salmon packing, operating their cannery at Anchorage, Alaska; that the method of obtaining fish for canning remained unchanged and there was no attempt to alter the relationship between the plaintiffs and the fishermen who sold fish to them following the effective date of the Social Security Act, so as to try to avoid the effects of that Act, if applicable to them.

2. During all of the times herein mentioned, the plaintiffs reported and paid So-

cial Security Tax upon all of the persons who received compensation from them in connection with their fish canning operations, such as "tendermen" "beachmen," "winchmen," "fish pitchers," machinists," "mechanics" and the "Filipino cannery crew," but did not report for Social Security Tax any of the persons from whom they purchased fish.

3. In June, 1943, a Deputy Collector of Internal Revenue for the District of Washington and Alaska, upon being given access to the plaintiffs' fish ledgers, classified the individuals selling fish as "employees," and computed a tax based upon the payments for fish purchased from such persons upon the theory that the sums involved in such purchases constituted wages. The plaintiffs paid, under protest and threat of distraint, the amount demanded, and thereafter duly filed claims for refund, which were rejected.

4. That beginning in 1928, and each year thereafter until 1933, the plaintiffs made contracts, generally oral, with local resident fishermen for the purchase by the plaintiffs and sale by the fishermen of the fish which the plaintiffs needed in their canning operations, the prices being fixed as the result of individual bargaining. In the year 1933, the price of fish was fixed by collective bargaining negotiations conducted on behalf of the fishermen by the Alaska Fishermen's Union, Cook Inlet Branch, a local of the C.I.O. International Fishermen's Union, and this arrangement continued until the year 1940. Thereafter, the negotiations with the Fishermen's Union were conducted on behalf of the plaintiffs by an association of packers known as the Alaska Salmon Industry, Inc.

5. This over-all contract between the Alaska Salmon Industry, Inc., and the union which represented the fishermen and all other persons employed by the plaintiffs required that all of them be members of the union and pay dues thereto. These contracts were general in their terms and covered conditions and situations as to wages, hours, over-time pay and such provisions as are usually found in a contract of employment entered into between a labor organization and an employer. The contract provisions covering the fishermen related to the price per fish when such fishermen used the company gear, and when they used their own gear, and made provisions for compensation to be paid fishermen when hanging and salvaging company gear; it provided that the company should deduct union membership dues; the fishermen agreed to operate in accordance with federal and territorial regulations; if the company furnished the gear, such gear was to be in first-class condition, and if the company failed in this respect, the fishermen would not be held responsible for loss of fish; where the company did the hanging of the webbing, it assumed the responsibility of having it properly hung before being distributed to the fishermen, and it agreed to furnish all equipment for blue-stoning gear where it was supplying such gear. There was further provision that any dispute as to gill-net fishing locations was to be settled by the union, and the company would recognize such settlement. The company reserved the right to limit the fishermen's catch, whether it be gill-net or hand-trap fish.

6. After 1933, the plaintiffs bought fish only from fishermen who were members of the union, but made oral individual contracts with such fishermen, and the over-all contract between the union and the plaintiffs governed as to the price per fish that the plaintiffs were required to pay to the fishermen for their fish. The plaintiffs would deduct the union dues from the amounts owing the fishermen, and by the payment of such dues the fishermen became qualified members of the union.

7. About fifteen per cent of the plaintiffs' fish supply was taken by trap-fishermen, and the remainder thereof by gill-netters. The trap-fishermen owned or leased their trap locations. They supplied all of the equipment and labor for constructing the traps except netting and guy wire. They paid their own license[a] fees; they commenced construction of their traps at such time as they regarded proper, and operated entirely without direction or supervision from the plaintiffs. The gill-net fishermen who furnished fish to the plaintiffs during the period in question were all local residents. They paid their own license fees and complied with national and local regulations concerning the taking of salmon from the Alaskan waters. Each fisherman owned his own fishing location, and exercised, by custom, a proprietory control of such location. These locations, while not recognized by law as the property of the gill-net fishermen, are considered by long-established custom as belonging to the fishermen, and made the subject of barter and sale, such sale price ranging from $200 to $7,000 for a single location.

8. The price the plaintiffs paid to the fishermen for fish was fixed in the union contract and provided a differential allowing a higher price to fishermen who supplied all of their own gear than to those who used "company gear," and a fisherman supplying his own gear had an average investment, apart from his fishing location, of approximately $1,200.

9. Approximately twenty-five per cent of the fishermen here involved had helpers who had no contractual relationship with the plaintiffs, and received no payment whatever from plaintiffs, such helpers frequently being the members of the fishermen's families, and in some instances being persons not identified with the union by membership, or otherwise, receiving compensation from the fishermen.

10. The plaintiffs at no time asserted any right to direct the fishermen as to where, or how, or when they should fish. Each fisherman received compensation in direct proportion to the number of fish he caught and delivered.

11. Under the arrangement between the union, the plaintiffs and the fishermen, the plaintiffs took the entire catch of the fishermen for the season, with few minor exceptions, and the fishermen were required to sell their catches to the plaintiffs. The general contracts existing between the union and the plaintiffs, insofar as they cover fishermen, provided: "The companies agree to buy and the fishermen agree to sell salmon," and then they further provide, "Each company agrees to buy from its fishermen, and the fishermen agree to sell to their company, all the fish caught by them." The contracts, however, in no manner direct the time or place or manner in which fish shall be caught nor any limit under 650 fish per fisherman in a twenty-four hour period for gillnet and hand-trap fishermen, and 1500 fish for seine fishermen.

12. The master contract, insofar as the fishermen were concerned, contained no provision whatever requiring the fishermen to fish at any given time or place, nor subjecting them to direction or control by the plaintiffs, neither did it contain any provision requiring the plaintiffs to compensate the fishermen, other than on a "per fish" basis, for such fish as the fishermen caught and delivered. Each fisherman was left free to fish or not, as he desired.

13. There were from 100 to 130 fishermen per season supplying fish to the plaintiffs, and their individual receipts for the sale of fish ranged from as low as $12 per fisherman to a sum in excess of $4,000, with an average of approximately $700.00.

Upon the facts as stated, the question presented is whether the fishermen were "employees" within the provisions of the Federal Insurance Contributions Act, formerly Title 8 of the Social Security Act. The amendment of the original Act made no change in the definition of the term "employee," nor has there been any change in the Treasury regulations in reference to the criteria as to when a person is an employee.

The Act, as originally written, and as it now exists, defines "wages" and "employment" as follows:

"The term 'wages' means all renumeration for employment."

"The term 'employment' means any service of whatever nature, performed within the United States by an employee for his employer." 26 U.S.C.A. Int.Rev.Code, § 1426(a) and (b).

The regulations promulgated by the Treasury Department, which were effective during all times herein, provide:

"The relationship between the person for whom such services are performed and the individual who performs such services, must as to those services be *the legal relationship of employer and employee*. Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer, not only as to what shall be done, but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work of the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and

methods for accomplishing the result, he is an *independent contractor*. An individual performing services as an independent contractor is not as to such services an employee." (Italics mine) Treasury Regulation 91, Art. 3, now Treasury Regulation 106, Sec. 402.204.

From the foregoing it is evident that the Court is compelled to adopt the commonly accepted tests to ascertain the relationship between the plaintiffs and the individuals who supplied them with the fish that they used in their salmon-canning operations, the specific question being: Were such persons employees or individuals engaged in an entrepreneurial enterprise?

■ There have been numerous decisions on this question, and all of them, so far as I have been able to ascertain, hold that the common-law tests shall be applied in ascertaining, from an established set of facts, whether the relationship be that of an "employee" or an "independent contractor." Burrus v. Early, D.C., 44 F. Supp. 21; Aberdeen Aerie No. 24 v. United States, D.C., 50 F.Supp. 734; Hirsch v. Rothensies, D.C., 56 F.Supp. 92; Texas Co. v. Higgins, 2 Cir., 118 F.2d 636; Jones v. Goodson, 10 Cir., 121 F.2d 176; Williams v. United States, 7 Cir., 126 F.2d 129; Anglim v. Empire Star Mines, 9 Cir., 129 F. 2d 914; Matcovich v. Anglim, 9 Cir., 134 F.2d 834.

■ I shall not attempt an analysis in detail of the judicial interpretations and distinctions made as between an "employee" and an "independent contractor" by the foregoing decisions. An examination of all of these cases, however, discloses that they deal with the same provisions of Title 8 of the Social Security Act, now designated as the Federal Insurance Contributions Act, as are involved in this case, and from the facts in each of these cases the well-known common law distinctions between an "employee" and an "independent contractor" are recognized just as the Treasury Department, in its regulations, recognizes them. This Court, therefore, is compelled to apply common law standards in distinguishing between "employees" and "independent contractors" in disposing of this case, and it cannot rest its decision upon a construction that will be so liberal by its terms as to expand the benefits of the Federal Insurance Contributions Act, however desirable such expansion might be. There is nothing in the language of the original Act, or its modifications and amendments, or the regulations that the Treasury Department has promulgated for its effective enforcement, or the judicial interpretations placed upon it, that would support a conclusion that the Act must be construed so as to reject conventional limitations upon the customary definitions given to the terms "employee", "employer" and "independent contractor."

The plaintiffs place great reliance upon the case of Columbia River Co. v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750. This case deals with processors of fish, on the one hand, and fishermen and their association, on the other hand, and squarely presents the issue as to whether such fishermen are "employees" or "independent contractors," and there is another point of similarity in that the fishermen in that case were members of a union. The court clearly adopts the well-known and traditional legal distinctions between "employee" and "independent contractor." It becomes authority, therefore, in interpreting the Acts that it had under consideration. The Hinton Case, however, does not deal with an interpretation of the provisions or language of the Federal Insurance Contributions Act, with which we are here concerned, but deals solely with matters involving an interpretation of the Sherman Anti-trust Act and the Norris-LaGuardia Act.

■ The issue presented in the instant case must turn exclusively upon: (1) The language of the Federal Insurance Contributions Act; (2) the regulations promulgated by the Treasury Department for its enforcement; and (3) the judicial determinations made by the Courts in construing the Act and regulations, and I rest my decision herein upon such considerations.

I arrive at the foregoing conclusion because of the very recent decision by the Supreme Court of the United States, National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, wherein the Court was construing the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and in so doing, it announces unqualifiedly that the rule to be followed in the construction of remedial legislation, such as was there involved and is likewise involved in this case, for the determination as to when one is classed as an "employee" or an "independent contractor" must be controlled entirely by the language of the Act, and the application given to that language by the agency created by Con-

286

gress to administer it. The Court there said:

"The mischief at which the Act is aimed and the remedies it offers are not confined exclusively to 'employees' within the traditional legal distinctions separating them from 'independent contractors.'" 322 U.S. page 126, 64 S.Ct. page 858.

I point out the foregoing to indicate that the construction placed upon the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7, 15 note, the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., in the Columbia River Co. v. Hinton, supra, and likewise the National Labor Relations Act, in National Labor Relations Board v. Hearst Publications, supra, cannot be finally determinative of the construction to be placed upon the Federal Insurance Contributions Act, and for that reason I reject as controlling precedents both the Hinton case and the Hearst Publications Case, and decide the instant case by adopting conventional standards of definition as to "employee," "employer" and "independent contractor," as those standards and the definition of those terms have been fixed by the Treasury Department in its regulations and by the Courts in interpreting the Act and the regulations in the decisions which I have heretofore cited. From these sources of authority, it is clear that the well-known, traditional and conventional principles of law that fix the status of an individual under facts such as are involved in this controversy must be accepted as the law controlling this case.

The defendant cites and relies upon two District Court decisions, contending that the facts therein are sufficiently similar to those in the instant case to be controlling. The cited cases are: Jacobson v. United States, D.C., 44 F.Supp. 685, and O'Hara Vessels, Inc., v. Thomas B. Hassett, Collector, which latter is not reported in the Federal Supplement, but is a District Court decision from the District of Massachusetts, designated as Action 1079, decided April 23, 1942, and found in 1944 Prentice-Hall Unemployment Insurance Service, Paragraph 36,195.

Examination of both cases indicates that the facts are so dissimilar to those in the case here for decision that they cannot be looked to as a precedent. In both cases the individuals involved were crew members, whose compensation was contingent upon a certain share of the revenue received from the gross catch of fish.

It is my opinion, and I find from the facts as stated, as a matter of law, that the fishermen were independent contractors, not subject to the orders or direction of the plaintiffs either as to when, where or how they should catch fish, nor as to the conditions under which they would carry on their operations, and the union contract wherein they were represented, in part at least, in their dealing with the plaintiffs, constituted as to them a cooperative selling contract, and the union was their selling agent. Liability for failure to carry out the covenants of this contract gives rise to an action growing out of the relationship of vendor and vendee or seller and purchaser, and not an action growing out of the relationship of master and servant or employer and employee, since it is the law that the relationship existing between the plaintiffs herein and the fishermen must be decided upon the well-recognized principles that distinguish an "employee" from an "independent contractor."

The judgment of the Court, therefore, will be that the plaintiffs are entitled to recover the sum prayed for in their complaint, together with interest thereon, and, upon notice, a decree to that effect may be submitted.